IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 23-422 |
| KIMBERLY LAWSON,<br>a/k/a "Kimberly Kane" | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

I.  **BACKGROUND**

Beginning in 2018, Kimberly Lawson, a/k/a "Kimberly Kane," engaged in the unauthorized use of her employer's identity and embezzled nearly $250,000 from him and his company by making materially false and fraudulent representations to his bank, Citizens Bank. She continued the embezzlement well after she was confronted about the theft by her employer, admitted to stealing and allowed to keep her job because she agreed to pay him back, and after she was terminated from her employment. Next, in 2020, while still embezzling money, Lawson and her husband submitted numerous fraudulent applications for Economic Injury Disaster Loans ("EIDL") offered by the Small Business Administration ("SBA") and successfully obtained two such loans.

Here,[1] Lawson's fraudulent activity began shortly after she became employed as a bookkeeper/office manager at Philadelphia-based Bala Electric Corporation ("Bala"), an electrical contracting firm specializing in commercial and large-scale residential construction with approximately eight employees. Her responsibilities included tracking employee hours, invoices, and vendor payments, and writing checks to vendors from the company's Citizens Bank account. Lawson was also responsible for reconciling the bank statements from Citizens Bank, reviewing

---

[1] Most of the information in the following paragraphs is consistent with paragraphs 14 through 29 of the Presentence Investigation Report ("PSR") dated April 9, 2025.

images of checks, and confirming the checks cleared. D.F., the owner, was supposed to review and authorize all checks before they were sent out. Lawson did not have signature authority on the checks but was authorized to use D.F.'s signature stamp to sign the checks but only after he authorized them. Lawson did not have authority to sign or send checks other than those he authorized. On limited occasions, D.F. authorized Lawson to stamp his name on a check payable to herself so she could take the check to the bank, cash it, and return the money to D.F. The money was never intended for Lawson's personal use. It was always for D.F.'s business. D.F. and Lawson were the only individuals in the company who performed this type of work and had access to the financial accounts and the signature stamp for checks. Most importantly, Lawson had the ability to make online financial transactions, authorized and unauthorized, with Bala's Citizens Bank account.

In early January 2020, a representative of Citizens Bank notified D.F. that approximately $15,000 in checks made out to vendors and employees had been deposited into an external bank account associated with Lawson, rather than with Bala. D.F. confronted Lawson, who admitted that she had misappropriated money and apologized for stealing. D.F. agreed to keep Lawson on as an employee until she paid him back. D.F. reduced Lawson's responsibilities in the office and thought he had prevented Lawson from having access to blank checks and his signature stamp, but Lawson still had access to payroll because that was a part of her responsibilities.

Lawson made no effort to pay back the stolen money and in March 2020, Lawson stopped coming to work due to the COVID-19 pandemic. However, in February 2020, D.F. filed a complaint with the police.

In or around April 2020, after D.F. reported $5,600.00 in total payroll for the week to ADP (his payroll services provider), he learned that Lawson contacted ADP on her own and reported an altered figure to include an additional $1,600.00 in payroll for D.F. and another employee, claiming

2

non-taxable expenses. Upon learning this information, D.F. terminated Lawson the first week of April.

In May 2020, after Lawson's termination, D.F. discovered Lawson used D.F.'s login information to sign into his ADP account and initiated two separate disbursement payment requests from D.F.'s 401k account (with ADP) for $12,813 and $4,299. The unauthorized logins were from an IP Address associated with Lawson's home address. D.F. was able to cancel the transactions before they were funded.

With the assistance of a new bookkeeper and a forensic accounting firm, D.F. discovered that Lawson caused fraudulent vendor and employee payments, unauthorized payroll transactions, and unauthorized ACH payments, with anticipated losses of over $200,000. Their internal investigation also revealed that to avoid discovery of her fraudulent activities, Lawson intentionally mislabeled entries in the company's accounting software, making them look authentic by recording them as legitimate payables.

Records from Bala's compromised Citizens Bank account revealed at least 278 unauthorized checks issued between May 2018 and February 2020 with total losses of $137,793.82. Of these, 180 checks totaling $83,413.14 were made payable to "Kimberly Lawson" and 10 were issued to her husband, a non-Bala employee or vendor, totaling $5,121.62. Checks totaling $16,661.72 were made payable to eight actual Bala employees and deposited via mobile deposit into bank accounts under Lawson's control. The remainder of the checks were issued payable to various vendors and business entities, including, Comcast, Verizon, and PECO, were also deposited via mobile deposit into bank accounts under Lawson's control. None of the checks made payable to the vendors were received by the vendors.

A total of 208 unauthorized ACH transactions to entities, such as Geico, Citibank, Capital

One Auto, Venmo, and Verizon, were initiated from the compromised Citizens Bank account for a total of $40,350.67 from June 2018 until July 2021. Each entity confirmed the payments satisfied or corresponded with amounts owed on Lawson's and her husband's personal accounts and were unrelated to any business conducted on behalf of Bala.

From April 2018 to April 2020, a total of 218 unauthorized payroll transactions, totaling $72,673.31, were diverted to accounts in Lawson's control in the names of 27 different individuals, most of whom were at one time employees of Bala. Lawson also reported more hours to payroll than what employees submitted on his or her timesheet. In such instances, the overpayments were directed to accounts under Lawson's control without detection by the employees in whose names the transactions were initiated. Review of the payroll records also revealed instances when Lawson improperly and without authorization either increased the number of hours she claimed to have worked or otherwise characterized additional compensation so that when she processed payroll transactions, she was paid more than she should have been paid. Such instances totaled $4,480.

The total amount of actual losses attributed to Lawson was at least $250,817.80. See PSR ¶ 25.

In addition to the embezzlement, Lawson fraudulently sought $253,874 in EIDLs from the SBA, filed in 15 separate applications in different names including her own. Only the applications that she submitted in her husband's and his sister's names were approved for funding, with each receiving $8,500 and $14,500, respectively. Among numerous false statements made in the applications, Lawson falsely represented that she had a retail business, that her husband had a construction business, and her sister-in-law had a cleaning business. The monies obtained from the fraudulent applications were deposited into bank accounts controlled by Lawson.

The only fraud loss attributed to Lawson in the indictment is as the result of the fraudulent

application Lawson submitted to the SBA in her husband's name. However, based on the fraudulently obtained loans in her husband's and sister's names, funded via the SBA, amounted to $23,000 in actual losses.

In sum, the fraud loss attributed to Lawson for Counts One and Two is $250,817.80 and for Counts Three through Six is $23,000, for a total fraud loss amount of $273,817.80.

Based on the criminal activity at issue in this case, Lawson faces a Sentencing Guidelines range of 30 to 37 months' imprisonment, plus 24 months that must run consecutively to any sentence imposed, resulting in an effective guideline range of 54 to 61 months' imprisonment. The government recommends a sentence within the applicable Sentencing Guidelines range.

## II.     SENTENCING CALCULATION

### A.     Statutory Maximum Sentences

The statutory maximum sentence available under 18 U.S.C. § 1344 is thirty years of imprisonment and a statutory maximum $1,000,000 fine. Additionally, the statutory maximum period of supervised release is five years.

The statutory maximum sentence available under 18 U.S.C. § 1343 is twenty years of imprisonment and a statutory maximum $250,000 fine. Additionally, the statutory maximum period of supervised release is three years.

Defendant is subject to a mandatory sentence of two years' imprisonment for the aggravated identity theft charge and a statutory maximum $250,000 fine. Additionally, the statutory maximum period of supervised release is one year.

**Total:** 112 years' imprisonment, including a mandatory minimum sentence of 2 years' imprisonment, $2,250,000 fine, and five years' supervised release. Additionally, the defendant is liable for a $600 special assessment and restitution.

**B.**     **The Sentencing Guidelines**

| Item | Offense Level | Notes |
|---|---|---|
| Base Offense Level (18 U.S.C. § 1343 and 1344) | 7 | 2B1.1(a)(1) |
| Fraud Loss Total = between $250,000 and $550,000 Total - $273,817.80 | +12 | 2B1.1(b)(1)(G) |
| Substantial financial harm to one victim | +2 | 2B1.1(b)(2)(A)(iii) |
| Acceptance of Responsibility | -3 | 3E1.1(a) & (b) |
| Total | 18 | |

Lawson has a criminal history and falls into Criminal History Category III. Accordingly, the applicable sentencing guideline range is 30 to 37 months, plus 24 months to run consecutively to the 30 to 37 months for a total guideline range of 54 to 61 months' imprisonment.

**III.     SENTENCING ANALYSIS**

A thorough consideration of all of the sentencing factors set forth in 18 U.S.C. § 3553(a) suggests that the most appropriate sentence is one which considers the advisory guideline range of 54 to 61 months' imprisonment.

Notwithstanding the sentencing guidelines, the Third Circuit has set forth a three-step process which the district courts must follow in compliance with the Supreme Court's ruling in *United States v. Booker*, 543 U.S. 220 (2005):

(1)     Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before *Booker*.

(2)     In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation and consider our Circuit's pre-*Booker* case law, which continues to have advisory force.

(3)     Finally, they are to exercise their discretion by considering the relevant § 3553(a) factors in setting the sentence they impose regardless of whether it varies from the sentence calculated under the Guidelines.

*United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006) (quotation marks, brackets, and citations omitted) (citing *United States v. King*, 454 F.3d 187, 194, 196 (3d Cir. 2006)).

Therefore, this Court must consider all the sentencing considerations set forth in § 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

Herein, the government addresses the relevant § 3553(a) factors.

### A.   The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

This analysis of the relevant § 3553(a) factors begins with the undeniable fact that Lawson engaged in a serious criminal conduct that caused a significant financial hardship to her vulnerable employer. From almost the beginning of her employment at Bala, after being given nearly and obviously unchecked access to Bala's finances, Lawson took advantage of that access and began stealing. She also engaged in the unauthorized use of D.F.'s identity, all by making materially false and fraudulent representations to D.F.'s bank. When initially confronted with the theft of $15,000, Lawson confessed, but kept stealing from D.F.'s company and him even after she was terminated. And, while involved in the embezzlement scheme, Lawson fraudulently obtained monies from the

SBA's EIDL program. In total, Lawson converted approximately $273,817.80 in fraudulently obtained monies.

Lawson's deceitful actions occurred with regularity and planned so much so that she took steps to avoid detection of the unauthorized transactions by numerous methods, including cooking Bala's books, mislabeling entries in Bala's accounting software, and redirecting monies to accounts that she controlled through unauthorized ACH and payroll transactions. The fact that Lawson engaged in this scheme and coverup is not so shocking considering the fact that she had previously engaged in fraudulent conduct between August 2010 and March 2011, when she defrauded her then employer and corruptly obtained $293,564.85, even more than she obtained from Bala. Based on that criminal conduct Lawson was charged with wire fraud and sentenced to 21 months' imprisonment. That sentence obviously did not deter Lawson from committing the instant offenses. Furthermore, she committed the instant offenses while on supervised release.

Additionally, Lawson took advantage of the federal government's effort to quickly get relief funds into the hands of economically struggling business owners due to the COVID-19 pandemic. There was lax verification of the information submitted on EIDL applications. Lawson attempted to obtain $253,874, but only successfully obtained $23,000. See PSR ¶ 27.

Accordingly, pursuant to § 3553(a)(1), Lawson's criminal activities fall squarely within the class of cases to which the applicable guidelines are addressed and the nature of the offenses, coupled with her history and characteristics, counsel in favor of the recommended guidelines sentence.

>    **B.   The Need for the Sentence Imposed to Reflect the Seriousness
>          of the Offense, to Promote Respect for the Law,
>          <u>and to Provide Just Punishment for the Offense</u>**

The seriousness of Lawson's criminal conduct, as described above, is reflected in the applicable advisory guideline range. Furthermore, she has revealed herself as someone who is greedy in that she took advantage of D.F. and his assets for her and her husband's financial gain. She tremendously enriched herself in a short period of time between March 2018 and July 2021, at times when she otherwise had gainful employment. See PSR ¶ 100. While Lawson also suffered from a drug addiction during this time and afterward, as witnessed by this Court at pretrial hearings, her voluntary drug use in no way excuses her criminal activity.

For these reasons, the government submits that the need for the sentence imposed to reflect the seriousness of the offenses, promote respect for the law, and provide just punishment, per § 3553(a)(2), will be satisfied by imposing a sentence within the applicable advisory guideline range.

>    **C.   The Need to Afford Adequate Deterrence to Criminal Conduct,
>          <u>and to Protect the Public from Further Crimes of the Defendant</u>**

A factor in the sentencing determination is achieving both specific and general deterrence. As the courts of appeals have held both before and after *Booker*, deterrence under 3553(a) is not limited to deterrence of the particular defendant. *See, e.g.*, *United States v. Jordan*, 435 F.3d 693, 698 (7th Cir. 2006) (describing how Section 3553(a) "specifies that the court may consider the need for general deterrence and respect for the law"); *United States v. Glover*, 431 F.3d 744, 751 (11th Cir. 2005) (noting that pre-*Booker* and post-*Booker*, "the underlying goals of the statute and the Guidelines are retribution, general deterrence, incapacitation, and rehabilitation" (internal quotation marks omitted)); *see also United States v. Yeaman*, 248 F.3d 223, 232 (3d Cir. 2001) (referring to Section 3553(a)'s goals of "general deterrence, specific deterrence, retribution, and rehabilitation").

This consideration of general deterrence is a persuasive reason for imposing a prison sentence informed by the guideline range.

General deterrence is an important issue here because frauds like and exactly like that described in this case, are a significant problem in our society. Thus, a meaningful sentence, beyond the 21-month sentence imposed for the 2011 wire fraud charge is necessary to deter Lawson and other perpetrators of crimes involving identity theft and fraud who are considering similar schemes.

### D.  The Need to Provide Educational or Vocational Training, Medical Care, or Other Correctional Treatment

The government is unaware of a need in this case to adjust Lawson's sentence for educational training, vocational training, mental illness, or correctional treatment. Lawson has already benefitted from the Court-imposed drug treatment and Lawson appears to be in recovery. Therefore, the government is not aware of a need to make additional adjustments contemplated pursuant to 18 U.S.C. § 3553(a)(2)(D) for this defendant.

### E.  Restitution to the Victim

Here, restitution in the total amount of $273,817.80 should be ordered in this case. She can commence making payments through the Bureau of Prisons Inmate Financial Responsibility Program and continue to make payments to D.F. after the completion of the anticipated period of incarceration.

### IV.  CONCLUSION

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, the primary factors are the need for the sentence to reflect the nature and seriousness of the offenses, promote respect for the law, and deter future crimes. Therefore, balancing those factors supports the

recommended sentence within the applicable sentencing guideline range of 54 to 61 months' imprisonment.

        Respectfully submitted,

        DAVID METCALF
        United States Attorney


        _/s/ Anita Eve_____
        ANITA EVE
        Assistant United States Attorney

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the Government's Sentencing Memorandum has been provided via email and ECF filing to:

Timothy A. Wright, Esquire<br>
Timothy_Wright@fd.org

         /s/ ANITA EVE_____
ANITA EVE
Assistant United States Attorney

DATED:  April 11, 2025